In the United States District Court
Northern District of Texas
Dallas Division

| | |
|---|---|
| Kyle Love<br>     Plaintiff,<br><br>v.<br><br>Sabre Glbl, Inc. d/b/a<br>Sabre, Inc.<br><br>     Defendant | Civil Action No. _____ |

## Plaintiff's Original Complaint

Plaintiff Kyle Love files this Original Complaint against Sabre Glbl, Inc. d/b/a Sabre, Inc. and shows:

### Statement of Jurisdiction

1. This Court has federal question jurisdiction of the Americans with Disabilities Amendments Act and retaliation claims under 42 U.S.C. § 12117(a) and 42 U.S.C. § 2000e-5(f). This court has supplemental jurisdiction of Love's Texas Labor Code Chapter 21 disability discrimination and retaliation claims.

2. Venue is proper in the Northern District of Texas, Dallas Division because the unlawful employment practices were committed there.

### Parties

3. Plaintiff Kyle Love is an individual and a citizen of Texas.

4. Defendant Sabre Glbl, Inc. d/b/a Sabre, Inc. is a foreign corporation doing business in Texas. It may be served by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

## Summary of Claims

5. This lawsuit arises from Sabre's discrimination against Love because of his disability and its retaliation against Love after he engaged in protected activity. Sabre initially accommodated Love's disability, but withdrew its accommodation.

6. Sabre refused to grant Love another reasonable accommodation and refused to timely engage with Love in the interactive dialog about an appropriate accommodation after Love requested one.

7. Sabre retaliated against Love after he engaged in protected conduct.

8. Sabre fired Love because of his disability, his record of a disability and because Sabre regarded him as disabled. Sabre retaliated against Love for his reports of its illegal and discriminatory actions.

9. Sabre's stated reasons for its actions are a pretext for discrimination and retaliation.

## Factual Background

10. Love suffers from the disability of Delayed Sleep Phase Disorder (ICD G47.21) and the disorder of the sleep wake cycle (ICD G47.20). These are neurological conditions by which Love cannot properly regulate his

sleep/wake cycle without dangerous levels of sedation and stimulation. Love has suffered from this disability for years and manages it with several medications, sleep behavior modifications and light box therapy. Love is substantially impaired in the major life activity of sleeping and in the proper functioning of his neurological system.

11.  Sabre hired Love in September 2016 as a Principal in Information Security. In that role, Love had to evaluate, implement, operate, and ensure the availability of security tools on Sabre's corporate and commercial networks.

12.  Sabre gave Love high performance reviews in 2016 and 2017.

13.  Sabre advised Love it would give him a merit raise to be effective in October 2017.

14.   Sabre, for the first years of Love's employment, provided Love with the reasonable accommodations of using Sabre's work from home ability and informal flex-time. Because many of Love's duties required off-hours or unplanned incident response, Love was granted the reasonable accommodation of informal flex-time. Love could also work from home as allowed by Sabre policy. This reasonable accommodation worked well for both Love and Sabre.

15.  Sabre hired Roy Mellinger as its new Chief Information Security Officer and Senior Vice President ("CISO") in December 2017.

16. Mellinger ended the "work from home" ability for the entire department shortly after he started at Sabre.

17. When Mellinger ended the work from home ability, Love had been working remotely for several weeks due to a broken bone in his foot.

18. Sabre called Love into the office on February 13, 2018 to meet with his manager, Sean Lanham, and Employee Relations representative Linda Kemp to discuss the new policy and how to handle Love's absences from the broken bone and to discuss Love's concerns about Sabre's change in policy. In the meeting, Love expressed concerns about the removal of the reasonable accommodation under which he had been working.

19. Sabre, through Lanham and Kemp, asked Love to have his doctor complete a disability letter for both the sleep disorder and the broken bone (which was only a short-term disability).

20. Sabre, through Kemp, advised Love to use Paid Time Off while applying for short-term disability for the broken bone. By the time Love's short-term disability claim was approved, Love's foot had healed. However, Love had used a lot of his PTO time for waiting on this approval, which reduced the PTO available to him in future months.

21. Love returned to work in the office on February 26, 2018 after the broken bone healed.

22. Sabre did not discuss Love's pending request for an ongoing reasonable

accommodation with Love when Love returned.

23. Sabre, through Lanham, gave Love a First and Final Warning on March 9, 2018. This First and Final Warning said Love needed to be at his desk between 9 a.m. and 6 p.m. each day and, if not at his desk, Love needed to have noted his location on the team calendar.

24. Sabre threatened to discipline Love if he did not comply with the instructions in the First and Final Warning.

25. Alarmed by the First and Final Warning, Love again communicated his concerns about his disability and the need for a reasonable accommodation he had previously requested with Robyn Bormaster in Human Resources. Bormaster referred Love to Randy Smith for further follow-up on the reasonable accommodation request.

26. Sabre, through Smith, received an email from Love on March 12, 2018 detailing Love's disability and requesting a reasonable accommodation for his disability.

27. Sabre requested that Love obtain a letter from his physician about Love's disability and his need for a reasonable accommodation. Love did so.

28. Sabre received the letter from Love's physician on March 21, 2018. Love emailed this document to Dennon Butler as he had been requested to do. Love also sent a copy of this documentation to Betty Leet, Mellinger's Chief of Staff, Risk and Security because he wanted to keep her fully in the

loop on these discussions. Love also copied his then manager Lanham and his soon to be manager, Sanjit Kurup, with this reasonable accommodation request.

29. Love's physician's letter notified Sabre of Love's disability and suggested the reasonable accommodations of flexible working hours and remote work when the needs of the business did not require his physical presence.

30. Sabre did not respond to Love's request for a reasonable accommodation. Sabre did not enter into the interactive dialog about Love's request for a reasonable accommodation.

31. Sabre retaliated against Love after Love continued to request the reasonable accommodation.

32. Sabre blocked Love's ability to transition to posted positions on a team managed by Jeremy Blawn.

33. Sabre had told Love during his annual review on March 6, 2018 that Love would receive a merit increase. However, Sabre, through Lanham, advised Love on March 29 2019 that Love had not been recommended for a merit salary increase.

34. Sabre excluded Love from meetings he needed to attend.

35. Sabre did not contact Love or enter into any discussions about what reasonable accommodations would be granted to Love after Love submitted

his doctor's note on March 21, 2018.

36. Sabre made internal changes in the team alignment. Sabre's changes caused confusion on who Love's manager would be for a period of time.

37. During the week of April 9, 2018, Love learned that Lanham would no longer be his supervisor, but Love was not initially told who the new supervisor would be. In that week, Love was working on projects for Kurup's team and Love believed Kurup would be his manager.

38. At the time of this restructuring, there was an open Position in the Security Architecture group that would have reported to Kurup. Love had applied for this position multiple times and was qualified for it. Kurup told Love that Kurup wanted to hire Love for this position. However, Love did not receive that position.

39. Mellinger communicated to employees he "did not know what to do with [Love] and his little doctor's note."

40. Love received free passes to attend a RSA security conference in San Francisco on April 16-20, 2018. Love regularly attended such conferences to stay current on the latest trends in information security and to obtain professional education credits through ISC(2). Love needed to maintain various certifications to do his job.

41. Love notified Kurup during the week of April 9 2018 that Love would be attending the RSA conference from April 16-20, 2018. Love also noted this

absence to attend this conference on the team calendar. As a courtesy, Love also notified Lanham (who he believed was his former manager) that Love would be attending the RSA conference from April 16-20, 2018. Neither Kurup nor Lanham objected to Love's plan to attend the RSA conference.

42. Love attended the RSA conference in San Francisco between April 16-20, 2018. While attending the RSA conference, Love handled the normal duties and responsibilities of his position remotely.

43. On April 18, 2018, while Love was at the RSA Conference, Sabre announced that Love's his new manager would be Jeff Carroll with the Network Operations teams. This was a surprising assignment. Love did not possess the skill set required for Network operations. Sabre did not offer Love the training budget to acquire the skills to do that job as the standards Sabre required from its employees.

44. Sabre fired Love on April 23, 2018.

45. Sabre used Lanham, who was no longer Love's manager, and Robyn Bormaster from Human Resources to fire Love. They told Love he was fired because Love had not gotten Lanham's permission to attend the RSA conference. They told Love his absence was an unexcused absence. They also told Love he was fired for not placing his absence on the team calendar.

46. Sabre's stated reasons for terminating Love are false and are a pretext for discrimination and retaliation.

47. On April 23, 2018, Sabre contacted Love and left a voice message indicating that the purpose of the call was to discuss Love's ADAAA reasonable accommodation request that had been pending for approximately five weeks. Love had already been terminated by Sabre by the time Love received that voice message.

48. After Love was terminated, Love timely filed a Charge of Discrimination with the EEOC on June 7, 2018, which was automatically dual filed with the Texas Workforce Commission Civil Rights Division. The EEOC issued Love his Dismissal and Notice of Right to Sue on May 2, 2019.  Love timely sues.

## Causes of Action

## Disability Discrimination under ADAAA

49.  Love incorporates the preceding paragraphs as if restated.

50.  Sabre is an "employer" as defined by the ADAAA. 42 U.S.C. § 12111(5).

51. Love is an "employee" as defined by the ADAAA. 42 U.S.C. § 12111(4). Love was qualified to perform his job duties as Principal in Information Security Operations at Sabre.

52. Love was diagnosed with Delayed Sleep Phase Disorder and a disorder of the sleep wake cycle. Both disorders are recognized sleep disorders and are classified in the International Classification of Diseases as ICD G47.21 and ICD G47.20. These are neurological conditions by which Love cannot, without

dangerous levels of sedation and stimulation properly regulate his sleep/wake cycle.

53. The disorders are disabilities as defined by the ADAAA because they are physical impairments that substantially limit one or more major life activities, including but not limited to sleeping and operating a major bodily function such as normal functioning of his neurological system. 42 U.S.C. § 12102(1) and (2)(A) and (B). Love was also regarded as having an impairment under the ADAAA. 42 U.S.C. § 12102(3).

54. Sabre discriminated against Love in violation of the ADAAA in the terms and conditions of his employment because of his disability, his record of a disability and because Sabre regarded Love as disabled.

55. Sabre violated the ADAAA by not reasonably accommodating the known limitations of Love, who was a qualified individual with a disability in violation of 42 U.S.C. § 12112(b)(5)(A).

56. Sabre violated the ADAAA by refusing to engage in the appropriate interactive dialog with Love to discuss the appropriate reasonable accommodations after Love made his request for a reasonable accommodation.

57. Sabre violated the ADAAA by firing Love because of his disability, his record of a disability and because Sabre regarded Love as disabled.

58. Sabre subjected Love to a hostile work environment in violation of the ADAAA because of his disability, his record of a disability and because Sabre regarded Love as disabled.

59. Sabre's violations of the ADAAA damaged Love. Sabre caused Love to lose his income and benefits when it fired him in violation of the ADAAA.

60. Love seeks to recover all damages to which he is entitled for Sabre's violation of the ADAAA, including the recovery of his back pay, fringe benefits, front pay, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, attorney's fees and costs.

## Disability Discrimination under Texas Labor Code Ch. 21

61. Love incorporates the preceding paragraphs as if restated.

62. Sabre is an "employer" as defined by Tex. Labor Code § 21.002(8).

63. Love is an "employee" as defined by Texas Labor Code § 21.002(7). Love was qualified to perform his job duties.

64. Love was diagnosed with Delayed Sleep Phase Disorder and a disorder of the sleep wake cycle. Both disorders are recognized sleep disorders and are classified in the International Classification of Diseases as ICD G47.21 and ICD G47.20. These are neurological conditions by which Love cannot, without dangerous levels of sedation and stimulation properly regulate his sleep/wake cycle.

65. These conditions are disabilities as defined by Tex. Labor Code § 21.002(6) and (11-a) because they substantially interfere with the major life activity of sleeping and the normal functioning of Love's neurological system.

66. Sabre violated Texas Labor Code Ch. 21 by refusing to provide Love with a reasonable accommodation. Sabre violated Texas Labor Code Ch. 21 by refusing to engage in an interactive dialog on the appropriate reasonable accommodation after Love requested a reasonable accommodation.

67. Sabre discriminated against Love in violation of Texas Labor Code §21.051 in the terms and conditions of his employment because of his disability, his record of a disability and because Sabre regarded Love as disabled.

68. Sabre violated Texas Labor Code § 21.051 by firing Love because of his disability, his record of a disability and because Sabre regarded Love as disabled.

69. Sabre subjected Love to a hostile work environment in violation of Texas Labor Code § 21.051 because of his disability, his record of a disability and because Sabre regarded Love as disabled.

70. Sabre's violations of Texas Labor Code § 21.051 damaged Love. Sabre caused Love to lose his income and benefits when it fired him in violation of Texas Labor Code § 21.051.

71. Love seeks to recover damages to which he is entitled for Sabre's violation of Texas Labor Code § 21.051, including the recovery of his back pay, fringe benefits, front pay, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, attorney's fees and costs.

## ADAAA Retaliation

72. Love incorporates the preceding paragraphs as if restated.

73. After Love engaged in protected activity by formally making a request for a reasonable accommodation, Sabre retaliated against Love in violation of 42 U.S.C. § 12203.

74. Sabre, through Mellinger, belittled Love and "his little doctor's note."

75. Sabre blocked Love from transferring to different teams or positions for which Love was fully qualified.

76. Sabre excluded Love from meetings that Love needed to attend.

77. Sabre issued Love a First and Final Warning after Love requested a reasonable accommodation.

78. Sabre refused to award Love a merit increase after Love requested a reasonable accommodation even though Sabre had previously told Love that Love would receive a merit increase.

79. Sabre retaliated against Love by firing him because of his protected activity in requesting a reasonable accommodation.

80. Sabre caused Love to suffer damages because of its illegal retaliation in violation of 42 U.S.C. § 12203.

81. Sabre's retaliation damaged Love. Love lost his income and benefits because of Sabre's illegal retaliation against him.

82. Love seeks to recover the damages to which he is entitled because of Sabre's retaliatory actions against him, including back pay, front pay, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, and reasonable and necessary attorneys' fees and costs of court.

### Texas Labor Code Retaliation

83. Love incorporates the preceding paragraphs as if restated.

84. After Love made his protected request for a reasonable accommodation, Sabre retaliated against Love in violation of Texas Labor Code § 21.055.

85. Sabre, through Mellinger, belittled Love and "his little doctor's note."

86. Sabre blocked Love from transferring to different teams or positions for which Love was fully qualified.

87. Sabre excluded Love from meetings that Love needed to attend.

88. Sabre issued Love a First and Final Warning after Love requested a reasonable accommodation.

89. Sabre refused to award Love a merit increase after Love requested a reasonable accommodation even though Sabre had previously told Love that Love would receive a merit increase.

90. Sabre retaliated against Love by firing him because of his protected activity in requesting a reasonable accommodation.

91. Sabre caused Love to suffer damages because of its illegal retaliation in violation of Texas Labor Code § 21.055.

92. Sabre's retaliation damaged Love. Love lost his income and benefits because of Sabre's illegal retaliation against him.

93. Love seeks to recover the damages to which he is entitled because of Sabre's retaliatory actions against him, including back pay, front pay, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, and reasonable and necessary attorneys' fees and costs of court.

## Jury Trial

94. Love demands a trial by jury.

## Prayer

WHEREFORE, Plaintiff Kyle Love prays this Court enter a judgment declaring the acts and practices of Defendant Sabre Glbl, Inc. d/b/a Sabre, Inc. violate the ADAAA and Texas Labor Code and award Plaintiff the relief sought and enter such other and further relief to which Plaintiff is justly

entitled.

        Respectfully submitted,

        <u>/s/ Karen K. Fitzgerald</u>
        Karen K. Fitzgerald
        State Bar No. 11656750
        Johnston Tobey Baruch P.C.
        PO Box 215
        Addison, TX 75001-0215
        214.265.9958 (direct dial)
        214.740.6248 (Facsimile)
        karen@jtlaw.com

        Attorney for Plaintiff Kyle Love